ORIGINAL

1 Laurence M. Rosen, Esq. (SBN 219683)
2 THE ROSEN LAW FIRM, P.A.
   355 South Grand Avenue, Suite 2450
3 Los Angeles, CA 90071
4 Telephone: (213) 785-2610
   Facsimile: (213) 226-4684
5 Email: lrosen@rosenlegal.com

6 Lead Counsel for Lead Plaintiffs

7
                **UNITED STATES DISTRICT COURT**
8               **CENTRAL DISTRICT OF CALIFORNIA**
9

10 JAMES ROSE, ANTOINE DE
   SEJOURNET, and UNIVERSAL
11 INVEST QUALITY GROWTH
   INDIVIDUALLY AND ON BEHALF          CASE No.: 2:11-cv-03701-DMG -
12 OF ALL OTHERS SIMILARLY             MRW
13 SITUATED,
14
                    Plaintiff,          **AMENDED CLASS ACTION**
15                                      **COMPLAINT FOR VIOLATIONS**
           vs.                          **OF THE FEDERAL SECURITIES**
16                                      **LAWS**
17 DEER CONSUMER PRODUCTS, INC.,
   YING HE, YUEHUA XIA, ZONGSHU
18 NIE, EDWARD HUA, ARNOLD              **JURY TRIAL DEMANDED**
19 STALOFF, QI HUA XU, YONGMEI
   WANG, MAN WAI JAMES CHIU,
20 AND WALTER ZHAO
21
                    Defendants.
22
23
24
      Lead Plaintiffs Antoine de Sejournet and Universal Invest Quality Growth
25
   and named plaintiff James Rose (collectively "Plaintiffs"), individually and on
26
27 behalf of all other persons similarly situated, by their undersigned attorneys, for
28

                                        0
   Amended Class Action Complaint for Violations of the Federal Securities Laws

their complaint against Defendants, alleges the following based upon personal knowledge as to himself and his own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through his attorneys, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Deer Consumer Products, Inc. ("Deer" or the "Company"), securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet.  Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## **NATURE OF THE ACTION**

1.     This is a federal securities class action on behalf of a class consisting of all persons other than Defendants who purchased the common stock of Deer between August 13, 2009 and March 21, 2011, inclusive, (the "Class Period") seeking to recover damages caused by Defendants' violations of federal securities laws.

2.     Deer is a manufacturer of small appliances based in China.  It sells its products both outside of China under other brands, and in China bearing its own brand name.

Amended Class Action Complaint for Violations of the Federal Securities Laws

3.      As with many small appliance manufacturers,  2009 was a terrible year for Deer Consumer Products.  As the worldwide recession cut disposable income, consumers were more reluctant to spend on household goods.

4.      In 2008, Deer reported net income of approximately $3,532,000 in on $44,322,000 of revenue. in 2009 its reported revenue fell to $31,248,000, and its net income fell to $1,343,000.

5.      Deer was faced with a crushing debt burden (over $6 million) and, because of declining sales, an uncertain future.

6.      Deer had just "gone public" in late 2008, through a reverse merger. With its poor financial state, it would have presented an unappetizing target to investors.  Few investors are interested in investing in a struggling, declining, and barely profitable company.

7.      Without an infusion of capital, Deer's fate would likely have been that of many of its competitors -- it would have collapsed.

8.      Instead, Deer sought an infusion of capital from the United States Capital Markets.  The solution to its problem was simple -- it lied about its finances.

9.      Thus, to the U.S. investing public, Deer claimed 2009 revenues of $81,300,000 and net income of $12,400,000 -- 2.5 and 10 times its actual revenues and profits, respectively.

2

Amended Class Action Complaint for Violations of the Federal Securities Laws

10.    It reported its true financial condition to its regulator in China,  the Chinese State Administration of Industry and Commerce ("SAIC Filings").[1]

11.    It is apparent that the figures reported by Deer in its SAIC Filings are accurate -- rather than those reported to the SEC -- for several reasons:

a.  Deer is subject to serious penalties for making false statements in its SAIC Filings.

b.  Because Deer is a foreign (i.e. non-Chinese) company, the financial statements its PRC subsidiaries file with the SAIC must be audited by a Chinese certified public accountant in accordance with Chinese generally accepted accounting principles ("Chinese GAAP").  Chinese GAAP are substantially the same as U.S. GAAP, particularly in respect to revenue recognition.[2]

c.  Deer's 2009 financials and growth as reported to the SEC are extraordinarily higher than its historical financials and growth.

d.  Credit reports from Qingdao Intercredit Reports -- the Chinese equivalent of Duff & Phelps – use the much lower revenue and net income figures reported in Deer's SAIC filings.  When Deer

---

[1]  Plaintiffs' independently obtained the SAIC filings for Deer's subsidiaries.
[2]  See, paper titled: CESR'S ADVICE ON THE EQUIVALENCE OF CHINESE, JAPANESE AND US GAAPS, prepared by The Committee of European Securities Regulators; Accounting Standards for Enterprises No. 14 – Revenues; Promulgation date: 02-15-2006; Effective date:01-01-2007;  Promulgated by China Ministry of Finance.

3

Amended Class Action Complaint for Violations of the Federal Securities Laws

borrows from lenders in China, it faces disadvantageous terms because its true financial condition is known there.

    e.  Most importantly -- until 2009, Deer's SEC and SAIC filings matched. Indeed, its 2008 SAIC/SEC filings diverge only by rounding errors. It is only in 2009 (when Deer began to seek cash from U.S. capital markets) that the SAIC and SEC filings began to diverge.

12.    Indeed, Deer's SAIC and SEC filings began to diverge in Deer's quarterly report on Form 10-Q for the Quarter ending June 30, 2009. That very month, Deer had hired notorious stock promoter New York Global Group (the "NYGG") and Benjamin Wey as its exclusive promotional arm. The NYGG has been accused of running as a "front for illegal activities", and as a company used by Wey to conspire with family and friends to "secretly sell" stocks.

13.    When Wey sued in New York State Supreme Court on a defamation theory against the maker of these accusations, the court dismissed Wey's complaint because it held that the statements were *substantially true*.

14.    A similar conspiracy to profit from inflating a company's stock price is exactly what happened here. Without disclosing Benjamin Wey's involvement, Wey's sister Tian Yi Wei[3] acquired a 6.3% stake in Deer. She allegedly acquired

---

[3] Benjamin Wey legally changed his name from Benjamin Wei. According to Wey, it was to Americanize his name; according to his critics, it was to hide various

Amended Class Action Complaint for Violations of the Federal Securities Laws

her interest through purchases on the open market, though the majority of her purchases fall outside the trading ranges of Deer stock for the day provided.  Wei could not have purchased the shares on the open market; Deer gave her the shares.

15.    Deer misrepresented its revenue and net income to the U.S. investing public.  Because it lied, it was able to obtain financing -- and not only that, but financing on absurdly advantageous terms.  Thus, on December 17, 2009, Deer sold 6,900,000 shares at $11.00 per share, netting handsome profits of almost $71 million.   In that sale, shareholders were fooled into thinking they were buying shares in a thriving company earning approximately $0.30 per share for the nine months ended September 30, 2009. Instead they bought shares in a declining company, which earned (approximately) $0.03 per share for that same period.

16.    On March 14 and 21, 2011, analyst firm Alfred Little[4] published a report setting out Deer's true financial condition.  As a result, Deer's stock price fell sharply, damaging investors.

## JURISDICTION AND VENUE

17.    The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Securities Exchange Act, and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

---

unlawful acts attached to the name "Benjamin Wei".
[4] Alfred Little is a d/b/a for an analyst firm that analyses Chinese companies, and may also take long or short positions in those and other companies.

18.    This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. § 1331.

19.    Venue is proper in this Judicial District pursuant to §27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C.  § 1391(b)-(d) and under the rule of law announced in *Investors Protection Corp. v. Vigman*, 764 F.2d 1309 (9th Cir. 1985).

20.    In connection with the acts, conduct, and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mails, interstate telephone communications and the facilities of the national securities exchange.

## **PARTIES**

21.    Plaintiffs James Rose, Antoine de Sejournet and Universal Invest Quality Growth, as set forth in their PSLRA certification forms previously filed with the Court, incorporated by reference herein, purchased Deer securities at artificially inflated prices during the Class Period and have been damaged thereby.

22.    Defendant Deer is a Nevada Corporation whose principal place of business is located at Area 2, 1/F, Building M-6, Central High-Tech Industrial Park, Nanshan, Shenzhen, China 518057.

Amended Class Action Complaint for Violations of the Federal Securities Laws

23.     Deer became a U.S. publicly traded company through a process called a "reverse merger".  In a reverse merger, a defunct U.S. publicly-traded company "buys" a closely-held company; in return, the closely-held company's owners receive substantially all of the shares of the publicly-traded company.  The reverse-merger process, particularly where the closely-held Company is Chinese, have recently raised concerns among regulators that it is too open to fraud.  Over a dozen of Deer's peer companies -- Chinese closely-held companies that have gone public on the U.S. markets via reverse mergers with market capitalizations of $100 million and up -- have been exposed elaborate frauds.

24.     During the class period, Deer (the U.S. Company) owned Deer International (a British Virgin Islands company) ("Deer BVI").  Deer BVI in turn owned two operating companies, Winder Electric Group, Ltd., ("Winder") and Delta International, Ltd. ("Delta").  Deer also incorporated two new operating companies Deer Technology (AnHui) Co., Ltd. and Anlin Technology (Anhui), Co., Ltd. as subsidiaries of Winder.  However, during the Class Period, these subsidiaries did not produce any revenues.

Amended Class Action Complaint for Violations of the Federal Securities Laws

25.    The following chart shows Deer's corporate structure as of December 31, 2009:



26.    Winder and Delta design, manufacture and sell small home and kitchen electric appliances in China and worldwide.  Deer BVI acquired Winder on March 12, 2008.  Delta transferred all of its material operations to Winder between 2008 and 2009.

27.    When reference is made in this Complaint to "Deer's SAIC Filings", it is to the combined financial statements of Winder and Delta -- or, for the period in which Deer's sole asset was Winder, to the financial statements of Winder.

Amended Class Action Complaint for Violations of the Federal Securities Laws

28.    In China, in SAIC filings, a parent does not consolidate the financial statements of its majority owned subsidiary.   However, for purposes of this complaint, the financial statements of Winder and Delta are combined for ease of analysis, as these were the only operating companies that produced any revenue or income for Deer during the Class Period.

29.    Beginning July 17, 2009, the Company's stock was actively traded on the NASDAQ under the ticker "DEER."   Prior to that date, the stock was actively traded on the OTC Bulletin Board under the ticker "DEER".

30.    Defendant Ying He ("Ying He") was and is Deer's CEO and Chairman of its Board.   He is also a Director of Winder.   Ying He signed all of Delta's SAIC filings during the Class Period.    Ying He was the President and director of Winder during the Class Period.   Ying He was the legal representative of Delta during the Class Period and signed each of its SAIC filings that contained Delta's SAIC audited financial statements.

31.    Ying He owned 8,348,125 shares of Deer common stock or 36.94% of Deer's outstanding shares as of March 31, 2009.   As of March 2, 2010, Ying He reported owning 7,269,240 shares of Deer common stock.   During the period from March 31, 2009 to March 2, 2010, Ying He sold 1,078,885 shares of Deer common stock and violated SEC regulations by never filing the required form 4 with the SEC reporting such sale.   Based on the range in which Deer's share price traded in

Amended Class Action Complaint for Violations of the Federal Securities Laws

that time frame, Chiu received proceeds of between $3.0 million and $19.0 million for the sale of his Deer shares.

32.     Defendant Ying He's brother, Famin He ("Famin He") is Winder's Chief Executive.  Famin He is <u>not</u> a defendant in this action. Famin He, through Great Scale Holdings Limited owned 1,444,000 shares of Deer common stock or 6.39% of Deer's outstanding shares as of March 31, 2009.  Famin He was also Deer's Manager of Production during the Class Period. Famin He signed all of Winder's SAIC filings during the Class Period.  Because Famin He was not a 5% or greater shareholder after Deer did a public offering in July of 2009, it is uncertain exactly how many Deer shares Famin He sold and retained during the Class Period.

33.     Deer licenses the right to use its patents and trademarks from Ying He and his brother Famin He.

34.     Defendant Yuehua Xia ("Xia") was the Company's CFO from September 2008 to August 2009.  He is also the Chief Financial Officer of Winder.

35.     Defendant Zongshu Nie ("Nie") has been the Company's CFO since August 2009 and one of the Company's directors since April 2009. Throughout the Class Period, Nie was the Financial Controller of the Company. Nie reported ownership of 1,805,000 shares of Deer common stock or 7.99% of Deer's outstanding shares as of March 31, 2009. As of March 2, 2010, Nie reported ownership of 1,569,566 shares of Deer common stock.  During the period from March 31, 2009 to March 2, 2010, Nie sold 235,434 shares of Deer common stock

10

and violated SEC regulations by never filing the required form 4 with the SEC reporting such sale. Nie Based on the range in which Deer's share price traded in that time frame, Chiu received proceeds of between $918,000 and $4.5 million for the sale of his Deer shares.

36.     Defendant Edward Hua ("Hua") was a Director of the Company since April 2009, and currently serves as the Chairman of the Company's Nominating and Corporate Governance Committee.

37.     Defendant Arnold Staloff ("Staloff") was a Director of the Company since April 2009, and currently serves as the Chairman of the Company's Audit Committee.

38.     Defendant Qi Hua Xu ("Xu") was a Director of the Company since September 2009, and currently serves as the Chair of the Compensation Committee, and is a member of the Company's Audit Committee and Nominating and Corporate Governance Committee.

39.     Defendant Yongmei Wang ("Wang") has been the President of the Company since May 2010.

40.     Defendant Man Wai James Chiu ("Chiu") was a Director of the Company from September 2008 to April 2009. Chiu has been the Company's Chief Operating Officer and Head of its Asia Pacific Division since September 2008. Chiu owned 1,083,000 shares of Deer common stock or 4.79% of Deer's outstanding shares as of March 31, 2009.  On March 2, 2009, Deer's 10-K reported

11

Chiu owned 941,740 shares of Deer common stock.  During the period from March 31, 2009 to March 2, 2010, Chiu sold 141,260 shares of Deer common stock and violated SEC regulations by never filing the required form 4 with the SEC reporting such sale.  Based on the range in which Deer's share price traded in that time frame, Chiu received proceeds of between $551,000 and $2.7 million for the sale of his Deer shares.

41.    Defendant Walter Zhao ("Zhao") was a Director of the Company from May 2009 to September 2009. Zhao was the Company's President from September 2009 to May 2010.

42.    Ying He, Nie, Hua, Staloff, Xu, Wang, Chiu, and Zhao are collectively referred to as the "Individual Defendants."

43.    The Individual Defendants together participated in the drafting, preparation, and/or approval of the various public, shareholder, and investor reports and other communications complained of herein and were aware of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature.  Because of their Board membership and/or executive and managerial positions with Deer, each of the Individual Defendants had access to the adverse undisclosed information about Deer's financial condition and performance as particularized herein and knew (or recklessly disregarded) that these adverse facts rendered the positive representations

12

Amended Class Action Complaint for Violations of the Federal Securities Laws

made by or about Deer and its business issued or adopted by the Company materially false and misleading.

## THE IMPORTANCE OF SAIC FILINGS

44.     Deer's two operating companies, Winder and Delta, were wholly owned foreign enterprises during the Class Period.

45.     As a result, they were each required to file with the SAIC annual financial statements that were audited in accordance with Chinese GAAP.

46.     Businesses that file inaccurate SAIC filings face a variety of penalties, including monetary fines and revocation of the entity's business license.[5]   If an entity's business license is revoked, the People's Bank of China[6] requires that the bank account of that entity be closed.[7]   Without a business license, the entity cannot legally conduct business in the PRC.   Without a bank account, an entity cannot practically conduct business.

## DEFENDANTS' FRAUDULENT STATEMENTS

47.     The Class Period begins on August 13, 2009, when Deer filed its quarterly report for the quarterly period ending June 30, 2009, with the SEC on Form 10-Q ("2009 2d Quarter 10Q.").   The 2009 2d Quarter 10Q was signed by

---

[5] "Measures for the Annual Inspection of Enterprises" issued in February 24, 2006, Article 20.
[6] People's Bank of China in PRC is equivalent to the Federal Reserve in the U.S.
[7] "Measures for the Administration of RMB Bank Settlement Accounts" issued in April 2003 (No.5 [2003]), Article 49.

13

Amended Class Action Complaint for Violations of the Federal Securities Laws

defendants Ying He and Yuehua Xia and, pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), was separately certified by defendants He and Xia, who each attested both to the accuracy of the financial statements and that the financial statements were free of fraud.

48.    In the 2009 2d Quarter 10Q, Deer reported the following revenue and net income:

|  | SEC 3 Months Ended 6/30/2009 | SEC 6 Months Ended 6/30/2009 |
|---|---|---|
| Revenue | $15,310,503 | $22,182,719 |
| Net Income | $1,714,876 | $2,371,750 |

49.    Deer's reported net income figure for three months ended 6/30/2009 was false because the $1.7 million of net income for these three months exceeded all of the revenue Deer reported in its SAIC filings for the entire fiscal year of 2009 by nearly $400,000.

50.    Deer's reported net income figure for the six months ended 6/30/2009 was false because its nearly $2.4million of reported net income exceeded all of the revenue Deer reported in its SAIC filings for the entire fiscal year of 2009 by $976,000.

51.    A comparison of Deer's financial statements for the three months ended June 30, 2009, and the three months ended March 31, 2009, further suggests that the 2009 Q2 financial results are false:

Amended Class Action Complaint for Violations of the Federal Securities Laws

| In USD (rounded to thousands) | Three months ended March 31, 2009 | Three months ended June 30, 2009 | Increase (percentage) |
|---|---|---|---|
| Revenue | $6,872,000 | $15,300,000 | 220% |
| Net income | $656,000 | $1,714,000 | 261% |
| Net margin | 9.5% | 11.2% | 118% |

52.    Previously, Deer had not shown such stark differences between the first and second quarters of its fiscal year:

| % difference between first and second quarters | 2009 | 2008 |
|---|---|---|
| Revenue | 220% | 125% |
| Net income | 261% | 70% |
| Net margin | 118% | 57% |

53.    To explain its first quarter results (lower than historical), Deer claimed the poor economy had resulted in lower sales.  To explain its second quarter results (much higher), Deer claimed that the results were attributable to increased sales in the U.S., Chinese, and Asia markets.

54.    Deer's false financial reporting continued in its Form 10-Q (the "2009 3d Quarter 10Q"), reported on November 11, 2009.  The 2009 3d Quarter 10Q was

15

Amended Class Action Complaint for Violations of the Federal Securities Laws

signed by defendants Ying He and Zhongshu Nie, and, pursuant to the Sarbanes-Oxley Act of 2002 ("SOX"), was separately certified by defendants He and Nie, who each attested both to the accuracy of the financial statements and that the financial statements were free from fraud.

55.    Deer's 2009 3d Quarter 10Q reported revenue and net income were false because the amounts for the nine months ended 9/30/2009 exceeded all of the revenue and net income that Deer reported in its SAIC filings for the entire twelve months of fiscal 2009.  Deer's 3d Quarter 10Q reported the following false revenue and net income figures relative to its full year 2009 SAIC filings:

|  | SEC 3 Months Ended 9/30/2009 | SEC 9 Months Ended 9/30/2009 | SAIC 12 Months Ended 12/31/2009 |
|---|---|---|---|
| Revenue | $26,541,039 | $48,723,758 | $30,595,588 |
| Net Income | $4,122,773 | $6,494,523 | $1,395,588 |

56.    Moreover, Deer's reported net income in its SEC filings for the three months ended 9/30/2009 that exceeded its SAIC reported net income for the entire year of 2009 by $2.7 million. Deer overstated its net income by nearly 300%. And its SEC reported revenue for those three months was nearly equal to its SAIC reported revenue for all of fiscal 2009.

57.    Defendants' filing with the SEC and reporting to investors Deer's false and misleading financial statements caused Deer's stock price to appreciate sharply, rising from $6.1 on August 13 (the day the 2009 2d Quarter 10Q was issued) to $14.76 on November 5 (the day the 2009 3d Quarter 10Q was issued).

16

Amended Class Action Complaint for Violations of the Federal Securities Laws

58.     Not coincidentally issuance of these false and misleading financial statements helped inflate Deer's stock price in advance of its secondary public offering of stock.

59.     On December 17, 2009, Deer completed an offering of 6,900,000 shares sold at $11 per share.  The proceeds to Deer were $70,938,900.  The sale was made pursuant to a Prospectus dated December 12, 2009, and Registration Statement dated October 9, 2009.  Both the Prospectus and Registration Statement repeated the false and misleading financial statements.  The Registration Statement was signed by Defendants Ying He, Nie, Hua, Staloff, and Xu.  Deer's PIPE investors also took the opportunity to unload the shares they had initially purchased in private placements, at substantial profits.

60.     Deer's Registration Statement was a so-called "shelf offering", allowing Deer to sell stock in the future.  Deer thereby registered up to $130,000,000 of shares, meaning that after the sale of stock, it still had $54.1 million of stock "on the shelf" to unload on investors at any time in the future.

61.     On March 2, 2010, Deer filed its annual report on Form 10-K for the year ended December 31, 2009 (the "2009 10-K").  The 2009 10-K presented false and misleading financial data.  Deer overstated its fiscal 2009 revenue by $50.7 million and overstated  its net income by almost $10.9 million. The overstatement is shown by this comparison between Deer's true performance in 2009 (taken from

its SAIC Chinese Regulatory filings) and the performance it claimed in its SEC filings:

|  | SEC Fiscal Year 2009 | SAIC Fiscal Year 2009 | Amount of Overstatement | Percentage Overstated |
|---|---|---|---|---|
| Revenue | $81,342,680 | $30,595,588 | $50,747,092 | 166% |
| Net income | $12,369,062 | $1,395,588 | $10,973,474 | 786% |

62.    As a Wholly Foreign Owned Enterprise, Deer is required to audit its SAIC filings and it did so for its 2009 SAIC annual filings.  There are no material differences between U.S. GAAP and Chinese GAAP.  Thus, there is no reason why there should be such an enormous material difference between SEC and SAIC filings.

63.    Indeed, before 2009, Deer's SAIC and SEC filings were strikingly similar.  Here are is a comparison of Deer's SEC and SAIC filings for FY 2008, i.e. before it had a catastrophic 2009, before it had to attract investor funds, before it was publicly traded:

| In USD (rounded to thousands)[8] | SEC Fiscal Year 2008 | SAIC Fiscal Year 2008 | SEC/SAIC |
|---|---|---|---|
| Revenue | $43,785 | $44,322 | 98.8% |
| Net income | $3,357 | $3,532 | 95.1% |

---

[8] Assumes an exchange rate of 6/9 RMB/USD.

18

Amended Class Action Complaint for Violations of the Federal Securities Laws

64. Except for some minor differences that can be accounted for by the difference in revenue recognition between China and U.S. accounting rules and exchange rate, the differences between the SEC reported figures and the SAIC reported figures are 4.9% of revenue and only 1.2% of net income.

65. Moreover, here are Deer's historical financials, as taken from SAIC filings:

| In USD, rounded to thousands[9] | 2006 | 2007 | 2008 | 2009 |
|---|---|---|---|---|
| Revenue | $29,273 | $36,602 | $44,322 | $31,248 |
| Net profit | $856 | $799 | $3,532 | $1,343 |

66. Deer's SAIC filings show a company gradually growing, until a global financial collapse affecting consumer demand worldwide causes it to suffer both a decrease in profits and revenue.  Deer's SEC filings, on the other hand, show a company gradually growing, until a global financial collapse affecting consumer demand worldwide causes it to double its revenues and quadruple its net income in a year.

---

[9] Exchange rate:
2006/ RMB 7.8 : USD 1
2007/ RMB 7.5 : USD 1
2008/ RMB 6.9 : USD 1
2009/ RMB 6.8 : USD 1

Amended Class Action Complaint for Violations of the Federal Securities Laws

67.     Neither did Deer undertake any capital expenditures that caused this purported dramatic change in its fortunes.  The value of its property and equipment as of December 31, 2009, and December 31, 2008, is virtually identical.

68.     Indeed, even the SEC -- which does not routinely engage in the business of second-guessing issuer's purported revenue figures -- was puzzled by Deer's extraordinary growth story.  A letter from the SEC to Deer dated May 19, 2010, specifically drew attention to the claims of abnormal growth:

> Refer to your discussion of revenues beginning on page 32. In light of the global economic slowdown, on which you comment in a risk factor on page 12, please expand your discussion to provide more detailed analysis specifically identifying the reasons (e.g. new products, new agreements, entering new markets, increased advertising, changes in pricing, etc.) behind the significant increases in revenue the company has experienced. Please be very specific in your response. For instance, you mention increased marketing efforts, particularly in China, but even US revenue increased 49% in 2009 and 108% during the first quarter of 2010. Please address this in your response, and explain why you believe that the concerns raised in you risk factor on page 12 have not resulted in decreased revenues, and instead, significantly higher revenues.

69.     In response, Deer stated:

> A portion of our expected revenue did decrease due to the economic slowdown in the U.S. and Europe. Our revenues in the fourth quarter of 2008 and the first quarter of 2009 in these geographic areas were lower than our expectation. The fourth quarter is typically our best quarter and can account for as much as 40% of our annual sales due to greater volume for Christmas in the U.S. and the European market. Yet in the fourth quarter of 2008, our sales were only $11.7 million or roughly 27% of our annual sales. In the first quarter of 2009, our sales were $6.9 million versus $9.1 million for the first quarter of 2008, or a

20

24% drop in revenue. Our revenues in Europe and North America decreased during the financial crisis as retailers reduced their inventory levels.

However, our revenue also increased in 2009 due to an increase by retailers of their inventory levels commencing in the second quarter of 2009 because retailers realized their inventories were too low relative to consumer demand. At that time, many of our smaller competitors who did not have our capital strength, economies of scale, and our low cost production abilities went out of business. Our U.S. revenue increased 49% in 2009, which we largely attribute to a gain in market share from our competitors in 2009 as the demand for our products came back. A weak fourth quarter in 2008 reduced our expected 2008 results. In 2009, the economic environment improved, but our first quarter was still weaker than expected. Our revenue increased 108% in the first quarter of 2010 largely due to improved demand, with Deer continuing to gain market share and experiencing improved revenues when compared to the weak first quarter of 2009.

70.   As noted above, according to both SEC and SAIC filings, Deer's revenue and net income actually increased in 2008, belying any notion that Deer's 2008 results were historically low.

71.   On May 10, 2010, Deer filed its quarterly report for the quarter ending March 31, 2010 (the "2010 1st Quarter 10Q").  The 2010 1st Quarter 10Q continued Defendants' implausible claims about Deer's financial results:

| In USD | Three months ended March 31, 2010 | Three months ended March 31, 2009 | 2010/2009 (in percentage) |
|---|---|---|---|
| Revenue | $23,902,000 | $6,872,000 | 348% |
| Net income | $4,037,000 | $657,000 | 614% |

Amended Class Action Complaint for Violations of the Federal Securities Laws

72.    On August 10, 2010, Deer filed its quarterly report for the quarter ending June 30, 2010 (the "2010 2d Quarter 10Q").

73.    The 2010 2d Quarter 10Q contained the same false and misleading 2009 2d Quarter revenue and income figures which were false for the same reasons described in ¶49- ¶51above.

74.    The 2010 2d Quarter 10Q claimed dramatic growth over the 2009 2d Quarter 10Q -- an achievement, since the 2009 2d Quarter 10Q already made false and misleading claims about revenue and income:

| In USD (rounded to thousands) | Three months ended June 30, 2010 | Three months ended June 30, 2009 | 2010/2009 (in percentage) |
|---|---|---|---|
| Revenue | $34,451,000 | $15,311,000 | 225% |
| Net income | $6,021,000 | $1,715,000 | 351% |

75.    On November 10, 2010, Deer filed its quarterly report for the quarter ending September 30, 2010 (the "2010 3d Quarter 10Q").

76.    The 2010 3d Quarter 10Q contained the same false and misleading 2009 3d Quarter revenue and income figures, which were false for the same reasons described in ¶55- ¶56 above.

Amended Class Action Complaint for Violations of the Federal Securities Laws

77.   The 2010 3d Quarter 10Q claimed dramatic growth over the 2009 3d Quarter 10Q:

| In USD | Three months ended September 31, 2010 | Three months ended September 31, 2009 | 2010/2009 (in percentage) |
|--------|----------------------------------------|----------------------------------------|---------------------------|
| Revenue | $55,263,000 | $26,541,000 | 208% |
| Net income | $9,266,000 | $4,123,000 | 225% |

78.   On March 10, 2011, Deer issued its annual report for the year ending December 31, 2010, on Form 10-K (the "2010 10-K").

79.   Deer's 2010 10-K contained the same false and misleading fiscal 2009 revenue and net income figures which were false for the same reasons described in ¶61 and ¶62 above.  Deer overstated its fiscal 2009 revenue by $50,747,092 and overstated its fiscal 2009 net income by $10,973,474.

80.   For comparison's sake, this graph presents Deer's purported results for FY 2010 with its actual results for FY 2009, as drawn from Deer's SAIC Filings:

| In USD | FY 2010 | FY 2009 | 2010/2009 |
|--------|---------|---------|-----------|
| Revenue | $175,847,000 | $31,248,000 | 563% |
| Net income | $30,349,000 | $1,343,000 | 2260% |
| Margin | 17.3% | 4.3% | 402% |

23

Amended Class Action Complaint for Violations of the Federal Securities Laws

81.    As between these two different books -- the SEC numbers and the SAIC numbers -- Qingdao Intercredit Services Pte. Co., Ltd., ("Qingdao") chose to believe the SAIC filings.  Thus, should Deer seek to obtain credit, it would do so under the terms of its SAIC filings.

82.    In particular, Qingdao reported the following regarding Winder (Deer's major operating asset) (all emphases added):

**PROFITABILITY: FAIRLY GOOD**
- The turnover of [SC -- "Subject Company" -- Winder] appears fairly good in its line, **but it decreased in 2009.**
- SC's net profit margin is fairly good in 2008, **but it decreased in 2009.**
- SC's return on total assets is fairly good in 2008, **but it decreased in 2009.**
- SC's cost of goods sold is average, comparing with its turnover in both years.

**LIQUIDITY: FAIR**
- The current ratio of SC is maintained in a normal level in 2008, **but fair in 2009.**
- SC's quick ratio is maintained in a normal level in 2008, **but fair in 2009.**
- The inventory of SC appears average in both years.
- The accounts receivable of SC appears average in both years.
- SC has no short-term loan in 2009.
- SC's turnover is in a fair level in 2009, comparing with the size of its total assets.

83.    Qingdao recommended a maximum credit line of $500,000.

84.    In addition, Qingdao reported that Deer had 1,100 employees, as opposed to the 1,900 it claimed in its SEC filings.

### Deer's CEO Concealed That He Directly Competes With Deer

85.    In both Deer's 2009 10-K and in its 2010 10K, Deer concealed that its Chairman and CEO He operated businesses that directly competed with Deer.

24

86.     The 2009 10-k and the 2010 10-K each state that "as of September 28, 2009, [Ying He] serves exclusively as Chairman and Chief Executive Officer."

87.     In truth, while serving as Deer's Chairman and CEO, Ying He is also serving as a director in and controls a Hong Kong registered company called 50HZ Electric.

88.     Ying He also served as a registered supervisor in Shenzhen Demeilong Electric Co., Ltd. ("Shenzhen DML"), a company owned by Qiyun Xu (51%) and Xianping He (49%).

89.     Qiyun Xu is Ying He's wife.  Qiyun Xu, the 51% owner of Shenzhen DML shares the same  residential address with Ying He.[10]

90.     Upon information and belief, Xianping He is Ying He's father.[11]

91.     According to an investigator hired by Alfred Little, an employee of the company occupying the location stated that 50HZ uses the Hong Kong address for correspondence, but 50HZ's operations are located in Shenzhen – at the same address as DML.

92.     Both 50HZ Electric and Shenzhen DML  manufactures and sells products that compete with Deer's lines.

---

[10]   Plaintiffs' investigator independently verified that Qiyun Xu is Ying He's wife.
[11]   They share the same family name - He;  Xianping He was born in 1940, while Ying He in 1968 and Famin He in 1973; Plaintiffs' investigator determined their faces on their ID picture looks very similar; All of them share the same "Place of Ancestral Origin"- Shanyang City in Shaanxi Province, a city 1500km far from Guangzhou where Deer is located. (Independently verified by Plaintiffs' investigator).

Amended Class Action Complaint for Violations of the Federal Securities Laws

93.    Regulation S-K requires disclosure in annual reports and prospectuses of the Company's executives and officers' business experience.  That Defendant He – Deer's Chairman and CEO – was secretly a director and owner of  two direct competitors of Deer was relevant under Regulation S-K, and non-disclosure of this information made Defendant Deer's statements materially misleading.

94.    Further, as revealed in Deer's own SEC filings, 50HZ is wholly owned by what Deer described as two of its shareholders.  Deer never disclosed that one of these shareholders is its Chairman and CEO.

95.    As revealed by bills of lading, 50HZ shipped large quantities of goods across the world.  50HZ shipped entire containers at a time -- each containing thousands of items.  Worse, 50HZ often shipped items from Winder's address, and to clients Winder also services.  Therefore, either Ying He is in direct competition with Deer, or -- the more likely possibility -- Ying He sells some of the goods produced by Deer for his own personal benefit through 50HZ.

## ADDITIONAL REASONS TO BELIEVE STATEMENTS PROVIDED TO CHINESE AUTHORITIES ARE ACCURATE AND STATEMENTS PROVIDED TO THE U.S. INVESTING PUBLIC ARE FALSE

96.    Where it is alleged that Defendant Ying He, the president and director of Winder, the CEO of Deer, and brother to the CEO of Winder, falsified Winder's earnings as reported in Deer's SEC filings, no additional proof of scienter is needed.

26

There is no non-culpable explanation of why Ying He would so dramatically inflate revenues.  Hence, this section focuses on falsity.

97.    Deer reported different operating margins to the SAIC and to its investors through SEC filings.

98.    In its SEC filings for FY 2009, it reported operating margins of 17.5%.  In its SAIC filings, it reported operating margins of 4.0%.  This is a fourfold difference, and therefore one of the two numbers is false.

99.    Deer touts its margins in the domestic Chinese market as the reason for its success.  Deer entered the domestic Chinese market in 2008, and sales in the domestic Chinese market have accounted for 5, 18, and 43 percent of Deer's sales in 2008, 2009, and 2010, respectively.

100.   Deer's competitors, most of which are better established, have much lower operating margins.

101.   Indeed, even as Deer entered the domestic Chinese market for small appliances, existing manufacturers were exiting the market because of its brutally low margins.

102.   As a senior official in BBK (a manufacturer of small appliances for the Chinese market) noted in commenting on BBK's decision to exit the market, there are few barriers to entry in the industry.  As a result of this entry, even the largest providers --Joyoung and Supor -- have seen *low* and, in 2010, *declining* margins.

Amended Class Action Complaint for Violations of the Federal Securities Laws

BBK, Joyoung, and Supor are all much larger than Deer, and therefore profit from economies of scale Deer cannot match.

103.   Meanwhile, Deer reports *high* and *increasing* margins in the very same sector for the very same time period.

## DEER AND THE NEW YORK GLOBAL GROUP

104.   In June 2009, Deer retained the notorious New York Global Group (the "NYGG") as its exclusive advisor.   Deer began falsifying its earnings on the quarter ending June 30, 2009, meaning that it began falsifying earnings the very quarter it hired NYGG as its promoter.

105.   Deer itself never disclosed its relationship with the NYGG.   However, the NYGG's website shows a picture of NYGG's President Benjamin Wey (or Wei) in a private jet with Deer's management, allegedly taken the night before the pricing of Deer's $75 million offering.

106.   Deer had good reason to hide NYGG's involvement.

107.   The NYGG and Wey have been involved in a number of litigations and regulatory proceedings relating to unlawful conduct involving securities.

108.   Prior to NYGG's involvement with Deer, NYGG had been employed by Bodisen Biotech, Inc.   Bodisen was listed on the NYSE Amex.   The NYSE Amex took the extraordinary step of removing Bodisen's shares from listing because of its involvement with NYGG and Wey, and because this involvement

cast doubt on the accuracy of Bodisen's financial statements.  As Bodisen explained in a current report on Form 8-K:

> Among other things, AMEX believes that the Company made insufficient or inaccurate disclosure in its public filings with regard to its relationship with, and payments to, a consultancy firm and its affiliates both prior to and subsequent to its listing on the AMEX. *Additionally, in the context of the Company's relationship with the consultancy firm, AMEX expressed concern that the Company has internal control issues related to its accounting and financial reporting obligations.*

109.   Wey was also involved as promoter to AgFeed Industries, Inc.  Gong Chen and the Global Consulting Group were hired to provide investor relations to AgFeed.

110.   Gong Chen sent a series of communications to executives at AgFeed, urging them to distance themselves from Wey.

111.   In an email to AgFeed's executives, Chen stated that "[m]any people wonder why [Wey] is not in jail for what he did to investors two years ago."

112.   In an oral conversation on February 4, 2008, Chen told the Chair of AgFeed's Board of Advisors that Wey "misleads the public as he secretly sells the stocks [he promotes] through his family and business friends and no one can trace it to him.  He did this with a number of companies."

113.   Chen also said that that "Wey's business [*i.e.*, NYGG] was a 'front for illegal activities,' and that Wey violated securities laws."

114.   Wey sued for defamation.

115.   In an opinion dated May 23, 2011,  Justice Sherwood of the New York State Supreme Court dismissed Wey's complaint.   Justice Sherwood dismissed Wey's claim because he held that the allegedly defamatory statements were *substantially true*.  The facts supporting this holding were:

-Wey was suspended by NASD in 2002

-Wey was censured by the Oklahoma Department of Securities and was

barred from seeking to do any brokerage or investment business in Oklahoma

-Wey recommended stocks without properly disclosing risks, made

unauthorized trades and failed to disclose that he had consulting agreements

with the companies whose stock he was selling

-Within six months of founding a firm called Benchmark Capital, he was

fired as its CEO and director by the Board "for cause" for insider trading and

misappropriating Benchmark funds.

116.   Although it is impossible to tell whether Deer continues to employ NYGG and Wey as its sole promoter,[12] since they scarce appear in Deer's filings, public sources indicate that NYGG and Wey are probably still Deer's sole promoters.   Thus, in an interview dated November 15, 2010, with thestreet.com, Wey stated that he was employed as a consultant by Deer.   Wey touted his

---

[12] A report in Barron's written by Leslie P. Norton dated June 18, 2011, indicated that Wey was still employed as a promoter for Deer Consumer.

Amended Class Action Complaint for Violations of the Federal Securities Laws

involvement with Deer, stating that he had known the company for three years and had visited it seven times.

117.   On March 28, 2011, Deer sued Alfred Little in New York state court. Although Alfred Little made a number of allegations in his initial and follow-up reports, the Complaint in the New York state action focused on only one of those allegations – allegedly fraudulent land purchases.  The Complaint did not discuss any of the other very serious allegations.

118.   Wey also stated -- falsely -- that Deer was the largest manufacturer of juicers and blenders in the world.

119.    One connection with Deer, however, Wey did not mention.  On September 20, 2010, Tian Yi Wei (Benjamin Wey's sister, and an employee of the NYGG), filed a report on Schedule 13D allegedly listing open-market purchases in Deer's stock that led to her owning 6.3% of Deer's stock.  She did not disclose that she was, in fact, employed by Deer's promotion firm and related to its President. Thus, Wey had an indirect substantial pecuniary interest in causing Deer to continue to file false and misleading income statements.

120.   Although Wei allegedly purchased her shares on the open market, most of her alleged purchases were outside the daily trading range of Deer's stock:

Amended Class Action Complaint for Violations of the Federal Securities Laws

| Trade date | Amount Purchased (sold) | Wei's price ($) | Low for the day | High for the day | Possible? |
|---|---|---|---|---|---|
| 7/26/2010 | 17403 | 7.61 | 8 | 8.39 | No |
| 8/18/2010 | 124645 | 7.64 | 7.73 | 8.19 | No |
| 8/19/2010 | 37672 | 7.6 | 7.7 | 8.07 | No |
| 8/20/2010 | 12308 | 7.61 | 7.59 | 7.87 | Yes |
| 8/23/2010 | 29402 | 8.14 | 7.65 | 7.88 | No |
| 8/24/2010 | 9840 | 7.81 | 7.32 | 7.65 | No |
| 8/25/2010 | 5650 | 7.64 | 7.2 | 7.71 | Yes |
| 8/26/2010 | 16731 | 7.67 | 7.6 | 7.83 | Yes |
| 8/27/2010 | 78753 | 7.39 | 7.6 | 7.84 | No |
| 8/30/2010 | 100000 | 7.44 | 7.74 | 8.04 | No |
| 8/31/2010 | 62338 | 7.61 | 7.8 | 8.22 | No |
| 9/2/2010 | 27524 | 7.86 | 8 | 8.44 | No |
| 9/7/2010 | 58701 | 8.28 | 8.03 | 8.39 | No |
| 9/8/2010 | 2800 | 8.21 | 8.27 | 8.5 | No |
| 9/9/2010 | 8400 | 8.02 | 7.66 | 8.42 | Yes |
| 9/10/2010 | 56129 | 8.15 | 7.99 | 8.18 | Yes |
| 9/13/2010 | -6300 | 8.41 | 8.03 | 8.3 | No |
| 9/14/2010 | 100511 | 8.06 | 8.05 | 8.23 | Yes |
| 9/15/2010 | 83511 | 8.05 | 8.09 | 8.34 | No |

Thus, of 19 trades identified by Wei, only 7 are even possible trades. Wei never bought her shares on the open market, which amounted to about 6.3% of Deer's outstanding shares. Measured another way, this is about $17 million in funds allegedly expended to obtain the shares. Deer gave her the shares.

**AGAINST DEFENDANT STALOFF**

121. Defendant Staloff has been engaged in a number of questionable China-based U.S. listed companies which are also NYGG's clients, including FEED, HEAT and CTEK. CTEK has been delisted from NASDAQ on March 1, 2011 for a serious disclosure violation related to a December financing.

**The SEC has Warned of Reverse Merger Companies Such as CAGC**

Amended Class Action Complaint for Violations of the Federal Securities Laws

122.   Chinese reverse mergers ("RCMs") have recently been a magnet for disreputable stock promoters, leading the SEC to issue warnings about investing in companies like Deer.

123.   Shielded by the geographic distance of thousands of miles and operating under a regulatory framework that is a world apart from the SEC's oversight, RCM companies have few incentives to provide complete and accurate disclosures to American investors. An August 28, 2010 article in *Barron's* by Bill Alpert and Leslie P. Norton entitled, "Beware This Chinese Export," discusses the enforcement problems that American regulators face when dealing with Chinese companies that trade on U.S. exchanges through RCMs. The article states that "[t]he SEC's enforcement staff can't subpoena evidence of any fraudulent activities in China, and Chinese regulators have little incentive to monitor shares sold only in the U.S."

124.   U.S. regulators have finally begun to take notice of the manipulation and fraud endemic in RCMs. The SEC has recently established a task force to investigate investors' claims regarding the impropriety and fraud of RCMs trading on the U.S. markets.  SEC Commissioner Luis A. Aguilar (the "Commissioner") discussed Chinese reverse mergers and the process of "backdoor registration," stating:[13]

---

[13] Text of the entire speech is available at
http://sec.gov/news/speech/2011/spch040411laa.htm#P79_43025.

Amended Class Action Complaint for Violations of the Federal Securities Laws

In the world of backdoor registrations to gain entry into the U.S. public market, the use by Chinese companies has raised some unique issues, even compared to mergers by U.S. companies. Two important ones are:

- First, there appear to be **systematic concerns with the quality of the auditing and financial reporting**; and

- Second, even though these companies are registered here in the U.S., there **are limitations on the ability to enforce the securities laws, and for investors to recover their losses when disclosures are found to be untrue, or even fraudulent**.

**I am worried by the systematic concerns surrounding the quality of the financial reporting by these companies**. In particular, according to a recent report by the staff of the Public Company Accounting Oversight Board (PCAOB), U.S. auditing firms may be issuing audit opinions on the financials, but not engaging in any of their own work. Instead, the U.S. firm may be issuing an opinion based almost entirely on work performed by Chinese audit firms. If this is true, it could appear that the U.S. audit firms are simply selling their name and PCAOB-registered status because they are not engaging in independent activity to confirm that the work they are relying on is of high quality. This is significant for a lot of reasons, including that the PCAOB has been prevented from inspecting audit firms in China.

125. On June 9, 2011, the SEC issued an Investor Bulletin warning investors about investing in companies that enter U.S. markets through RCM "…there have been instances of fraud and other abuses involving reverse merger companies." "Given the potential risks, investors should be especially careful when considering investing in the stock of reverse merger companies," said Lori J. Schock, Director of the SEC's Office of Investor Education and Advocacy.

Amended Class Action Complaint for Violations of the Federal Securities Laws

## LOSS CAUSATION

126.   On March 14, 2011, analyst Alfred Little ("Little") issued a report (the "March 14 Report") asserting that DEER had concealed material adverse information from investors.

127.   The March 14 Report also set forth a host of detailed criticisms that questioned the veracity of the information contained in the Company's financial statements and press releases. The Report listed a number of red flags and evidence contradicting the Company's annual reports and public statements filed with the SEC and issued to U.S. investors.  The potential red flags of fraud alleged in the Report included the following as summarized in the Report:

- Management misappropriated over $12 million on two recent land purchases.
- 2009 SAIC filing shows Deer really has a much smaller business with much less revenue and much less net income than Deer reported in its SEC fillings.
- Direct competition from Chairman He's unconsolidated related party - 50Hz Electric.

128.    On March 14, 2011, the Company filed with SEC a current report on Form 8-K, providing an immediate response and rebuttal to the March 14 Report. Deer vehemently denied the allegations of fraud and attempted to discredit the March 14 Report.  Deer's rebuttal prevented a significant decline in its stock price that otherwise would have resulted from the March 14 Report.

35

Amended Class Action Complaint for Violations of the Federal Securities Laws

129.   On March 21, 2011, Little published a follow-up report providing further evidence of defendants' alleged fraud, and which referenced the allegations of fraud in the March 14 report.

130.   On March 21, 2011, Deer's stock price fell 21.6% on extraordinarily heavy trading volume, damaging investors.  Deer never responded to, or attempted to rebut the additional evidence of fraud in the March 21 Report and its stock continued to fall in the following days as a result of the March 21 Report.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

131.   Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all persons who purchased the common stock of Deer during the Class Period and who were damaged thereby.   Excluded from the Class are Defendants, the officers and directors of the Company at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which defendants have or had a controlling interest.

132.   The members of the Class are so numerous that joinder of all members is impracticable.   Throughout the Class Period, Deer's securities were actively traded on the NASDAQ.  While the exact number of Class members is unknown to Plaintiff at this time and can only be ascertained through appropriate discovery, Plaintiff believes that there are at least hundreds of members in the proposed Class.

36

Members of the Class may be identified from records maintained by Deer or its transfer agent and may be notified of the pendency of this action by mail, using a form of notice customarily used in securities class actions.

133.   Plaintiff's claims are typical of the claims of the members of the Class, as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

134.   Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation.

135.   Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)   whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)   whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business, operations and management of Deer; and

(c)   to what extent the members of the Class have sustained damages and the proper measure of damages.

136.   A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is

37

impracticable.  Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to redress individually the wrongs done to them.  There will be no difficulty in the management of this action as a class action.

## Applicability of Presumption of Reliance:

## Fraud-on-the-Market Doctrine

137.  At all relevant times, the market for Deer's  common stock was an efficient market for the following reasons, among others:

(a)     Deer's stock met the requirements for listing, and is listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)     During the class period, on average, over 1.6 million shares of  Deer stock were traded on a weekly basis.  Deer had 33.6 million shares outstanding at the end of the class period.  Thus the average weekly trading volume for the whole Class Period as a percentage of shares outstanding at the very end of the Class Period was 5%, demonstrating a very active and broad market for Deer stock and permitting a *very strong* presumption of an efficient market;

(c)     As a regulated issuer, Deer filed periodic public reports with the SEC and was eligible and did file short form registration statements with the SEC on Form S-3 during the Class Period;

(d)     Deer regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of

38

press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services;

(e)    Deer was followed by several securities analysts employed by major brokerage firms who wrote reports that were distributed to the sales force and certain customers of their respective brokerage firms during the Class Period. Each of these reports was publicly available and entered the public marketplace;

(f)    Numerous NASD member firms were active market-makers in Deer stock at all times during the Class Period; and

(g)    Unexpected material news about Deer was rapidly reflected and incorporated into the Company's stock price during the Class Period.

138.  As a result of the foregoing, the market for Deer's common stock promptly digested current information regarding Deer from all publicly available sources and reflected such information in Deer's stock price.   Under these circumstances, all purchasers of Deer's common stock during the Class Period suffered similar injury through their purchase of Deer's common stock at artificially inflated prices, and a presumption of reliance applies.

Amended Class Action Complaint for Violations of the Federal Securities Laws

### FIRST CLAIM
**Violation of Section 10(b) Of**
**The Exchange Act Against and Rule 10b-5**
**Promulgated Thereunder Against All Defendants**

139.   Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

140.   This claim is brought against Deer and all of the Individual Defendants.

141.   During the Class Period, Defendants carried out a plan, scheme and course of conduct which was intended to and, throughout the Class Period, did: (1) deceive the investing public, including plaintiff and other Class members, as alleged herein; and (2) cause plaintiff and other members of the Class to purchase Deer's common stock at artificially inflated prices.  In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

142.   Defendants (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (c) engaged in acts, practices, and a course of business that operated as a fraud and deceit upon the purchasers of the Company's common stock in an effort to maintain artificially high market prices for Deer's common stock in violation of Section 10(b) of the Exchange Act and Rule 10b-5 thereunder.  All Defendants are sued either as primary participants

Amended Class Action Complaint for Violations of the Federal Securities Laws

in the wrongful and illegal conduct charged herein or as controlling persons as alleged below.

143.   Defendants, individually and in concert, directly and indirectly, by the use, means or instrumentalities of interstate commerce and/or of the mails, engaged and participated in a continuous course of conduct to conceal adverse material information about the business, operations and future prospects of Deer as specified herein.

144.   These Defendants employed devices, schemes and artifices to defraud, while in possession of material adverse non-public information and engaged in acts, practices, and a course of conduct as alleged herein in an effort to assure investors of Deer's value and performance and continued substantial growth, which included the making of, or participation in the making of, untrue statements of material facts and omitting to state material facts necessary in order to make the statements made about Deer and its business operations and future prospects in the light of the circumstances under which they were made, not misleading, as set forth more particularly herein, and engaged in transactions, practices and a course of business that operated as a fraud and deceit upon the purchasers of Deer's common stock during the Class Period.

145.   Each of the Individual Defendants' primary liability, and controlling person liability, arises from the following facts: (1) the Individual Defendants were high-level executives, directors, and/or agents at the Company during the Class

41

Period and members of the Company's management team or had control thereof; (2) each of these defendants, by virtue of his or her responsibilities and activities as a senior officer and/or director of the Company, was privy to and participated in the creation, development and reporting of the Company's financial condition; (3) each of these defendants enjoyed significant personal contact and familiarity with the other defendants and was advised of and had access to other members of the Company's management team, internal reports and other data and information about the Company's finances, operations, and sales at all relevant times; and (4) each of these defendants was aware of the Company's dissemination of information to the investing public which they knew or recklessly disregarded was materially false and misleading.

146. Defendants had actual knowledge of the misrepresentations and omissions of material facts set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them. Such Defendants' material misrepresentations and/or omissions were done knowingly or recklessly and for the purpose and effect of concealing Deer's operating condition and future business prospects from the investing public and supporting the artificially inflated price of its common stock. As demonstrated by Defendants' overstatements and misstatements of the Company's financial condition throughout the Class Period, Defendants, if they did not have actual knowledge of the misrepresentations and omissions alleged, were

Amended Class Action Complaint for Violations of the Federal Securities Laws

reckless in failing to obtain such knowledge by deliberately refraining from taking those steps necessary to discover whether those statements were false or misleading.

147.   As a result of the dissemination of the materially false and misleading information and failure to disclose material facts, as set forth above, the market price of Deer's common stock was artificially inflated during the Class Period.  In ignorance of the fact that market prices of Deer's publicly-traded common stock were artificially inflated, and relying directly or indirectly on the false and misleading statements made by Defendants, or upon the integrity of the market in which the common stock trades, and/or on the absence of material adverse information that was known to or recklessly disregarded by Defendants but not disclosed in public statements by Defendants during the Class Period, Plaintiff and the other members of the Class acquired Deer common stock during the Class Period at artificially high prices and were or will be damaged thereby.

148.   At the time of said misrepresentations and omissions, Plaintiff and other members of the Class were ignorant of their falsity, and believed them to be true.  Had Plaintiff and the other members of the Class and the marketplace known the truth regarding Deer's financial results, which were not disclosed by defendants, Plaintiff and other members of the Class would not have purchased or otherwise acquired their Deer common stock, or, if they had acquired such common stock

during the Class Period, they would not have done so at the artificially inflated prices that they paid.

149.  By virtue of the foregoing, Defendants have violated Section 10(b) of the Exchange Act, and Rule 10b-5 promulgated thereunder.

150.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their respective purchases and sales of the Company's common stock during the Class Period.

151.  This action was filed within two years of discovery of the fraud and within five years of each plaintiff's purchases of securities giving rise to the cause of action.

## SECOND CLAIM
### Violation of Section 20(a) Of
### The Exchange Act Against the Individual Defendants

152.  Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

153.  The Individual Defendants acted as controlling persons of Deer within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, agency, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and

44

disseminated to the investing public, the Individual Defendants had the power to influence and control, and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that plaintiff contends are false and misleading.  The Individual Defendants were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiff to have been misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or to cause the statements to be corrected.

154.   In particular, each Defendant had direct and supervisory involvement in the day-to-day operations of the Company and, therefore, is presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

155.   As set forth above, Deer and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.

156.   By virtue of their positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's common stock during the Class Period.

Amended Class Action Complaint for Violations of the Federal Securities Laws

157.   This action was filed within two years of discovery of the fraud and within five years of each Plaintiff's purchases of securities giving rise to the cause of action.

### PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

(a)    Determining that this action is a proper class action, designating Plaintiff as class representative under Rule 23 of the Federal Rules of Civil Procedure and Plaintiff's counsel as Class Counsel;

(b)    Awarding compensatory damages in favor of Plaintiff and the other Class members against all defendants, jointly and severally, for all damages sustained as a result of defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(c)    Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(d)    Awarding such other and further relief as the Court may deem just and proper.

Amended Class Action Complaint for Violations of the Federal Securities Laws

1

## <u>JURY TRIAL DEMANDED</u>

2

Plaintiff hereby demands a trial by jury.

3

4

5   Dated: September 5, 2011     Respectfully submitted,

6

7                          **THE ROSEN LAW FIRM, P.A.**

8

9

10

11                          Laurence M. Rosen, Esq. (SBN 219683)

12                          THE ROSEN LAW FIRM, P.A.
355 South Grand Avenue, Suite 2450

13                          Los Angeles, CA 90071
Telephone: (213) 785-2610

14                          Facsimile: (213) 226-4684
Email: lrosen@rosenlegal.com

15

16                          Lead Counsel for Lead Plaintiffs

17

18

19

20

21

22

23

24

25

26

27

28

Amended Class Action Complaint for Violations of the Federal Securities Laws

**CERTIFICATE OF SERVICE**

I, Leonid Prilutskiy, pursuant to 28 U.S.C. § 1746, hereby declare under penalty of perjury as follows:

I am an employee of the Rosen Law Firm, P.A. I am over the age of eighteen. On September 6, 2011, I served the following **AMENDED COMPLAINT FOR VIOLATIONS OF THE FEDERAL SECURITIES LAWS** by U.S. mail to counsel of record for all defendants at the address listed below:

William H. Forman, Esq. (SBN 150477)
Scheper Kim & Harris LLP
601 West Fifth Street, 12th Floor
Los Angeles, CA 90071-2025

Counsel for Defendant Deer Consumer Products, Inc.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. I declare that I am employed in the office of a member of the bar of this Court at whose direction the service was made.

Executed on September 6, 2011, in New York, New York.

Leonid Prilutskiy