**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen, Esq. (CSB# 219683)
355 South Grand Avenue, Suite 2450
Los Angeles, CA 90071
Telephone: (213) 785-2610
Facsimile: (213) 226-4684
lrosen@rosenlegal.com

Attorneys for Plaintiffs and the Class

UNITED STATES DISTRICT COURT
CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| JAMES ROSE, ANTOINE DE SEJOURNET, and UNIVERSAL INVEST QUALITY GROWTH INDIVIDUALLY AND ON BEHALF OF ALL OTHERS SIMILARLY SITUATED,<br><br>                    Plaintiff,<br><br>          vs.<br><br>DEER CONSUMER PRODUCTS, INC., YING HE, YUEHUA XIA, ZONGSHU NIE, EDWARD HUA, ARNOLD STALOFF, QI HUA XU, YONGMEI WANG, MAN WAI JAMES CHIU, AND WALTER ZHAO<br>                    Defendants. | No.: CV-11-03701-DMG (MRWx)<br><br>CLASS ACTION<br><br>**DECLARATION OF LAURENCE ROSEN IN RESPONSE TO THE COURT'S ORDER TO SHOW CAUSE DATED FEBRUARY 8, 2013**<br><br>Hon. Dolly M. Gee<br>Hearing Date:  March 8, 2013<br>Courtroom:  7 (Spring Street)<br>Time:  9:30 a.m. |

1.     At the outset, I apologize to the Court and to Defendants for missing the February 8, 2013 hearing. Because of human error, for which I have ultimate responsibility, the hearing was not properly calendared in my firm's calendaring system. As a result, I was unaware the hearing was set for February 8.

2.     Mr. Forman has indicated that he incurred costs and fees of $564 in attending the February 8, 2013 hearing. (Dkt. # 93). I have voluntarily paid Mr. Forman $564.  I have attached a true and correct copy of the letter I sent to Mr. Forman on the February 19, enclosing a check, as Exhibit 1 to this Declaration. The check was received by Mr. Forman's firm on February 20. *See* Exhibit 2.

3.     As a result of the missed hearing, I have amended my firm's calendaring system. Two different people are now responsible for calendaring any given event, and the next week's calendaring is now verified every Friday.

**A.     Response to the Court's Order to Show Cause.**

4.     The Court has asked Lead Plaintiffs' counsel to provide a sworn declaration demonstrating (1) Lead Plaintiffs' counsel's qualifications to serve as class counsel; (2) what Lead Plaintiffs have done to warrant an incentive award of up to $10,000 each; (3) what discovery Lead Plaintiffs undertook prior to negotiating the settlement; (4) whether the parties employed a third-party neutral to mediate their settlement; (5) a description of the negotiations; (6) why a settlement that is 4.03% of maximum estimated damages is fair, adequate, and reasonable; and (7) why the Legal Aid Foundation of Los Angeles is an appropriate cy pres fund recipient in light of *Naschin v. AOL, LLC*, 663 F.3d 1034, 1039-40 (9th Cir. 2011). I respond to the Court's requests in turn.

**B.    Lead Plaintiffs' counsel's qualifications.**

5.    Lead Plaintiffs have selected The Rosen Law Firm, P.A., as their counsel. A true and correct copy of The Rosen Law Firm's resume is attached as Exhibit 3 to this declaration. To summarize the Exhibit, Lead Plaintiffs' Counsel has been appointed by courts as lead plaintiffs' counsel in almost 50 securities class actions. Lead Plaintiffs' counsel has been lead or co-lead counsel in actions that have recovered over $88 million for shareholders, not counting confidential settlements. Lead Plaintiff has particular expertise in recovering funds from investors defrauded by China-based companies, and has been appointed lead or co-lead plaintiffs' counsel in 21 such actions. Lead Plaintiffs' counsel was sole class counsel in *Hufnagle v. RINO International Corp.*, No. CV 10-8695-VBF (VBKx) (C.D. Cal.), an action which has already recovered $7 million for investors -- the second largest recovery to date of any U.S. securities class action brought by investors against a China-based company. In *RINO*, the settlement included a $3.5 million joint payment from the company's CEO and the Chair of its Board -- an unusually high personal contribution. Since 2010, Lead Plaintiffs' counsel has tried three securities actions and one derivative action: *Sedaghat v. Roth Capital Partners, LLC*, No. BC-2732742 (Sup. Ct. County of Los Angeles); *Alexandros v. Kor Electronics, Inc.*, Case No. 06-CC-07881 (Sup. Ct. County of Orange); *Meruelo Capital Partners 2, LLC v. Dijji Corp.*, Case No. BC352498 (Sup. Ct. County of Los Angeles); and *Sawant v. Ramsey*, 07-cv-980-VLB (D. Conn.).[1] Lead

---

[1] Securities actions, famously, are rarely tried. For example, Jordan Eth and Emily Richman report that between 1995 and April 26, 2012, only nine securities fraud class actions were tried to a jury verdict. Jordan Eth & Emily Richman, Securities Class Action Jury Trials Since *In re JDS Uniphase Corp Sec. Litig*.: No Clean Victories, Practicing Law Institute, 1950 PLI/Corp 279, 281, 285-92. *See also* Kevin Lacroix, A Rare Spectacle: Two Securities Lawsuits Go To Trial, InSights,

DECLARATION OF LAURENCE ROSEN IN RESPONSE TO THE COURT'S ORDER TO SHOW CAUSE DATED FEBRUARY 8, 2013 No.: CV-11-03701-DMG (MRWx)

Plaintiffs' counsel has won three of these trials (*Sedaghat*, *Meruelo*, *Sawant*), and lost one (*Alexandros*). Thus, when securities plaintiffs' interests are best served by a trial, Lead Plaintiffs' counsel is willing and able to bring plaintiffs' claims to trial. Lead Plaintiffs' counsel has argued a number of precedent-setting opinions.[2] Lead Plaintiffs' U.S.-trained attorneys obtained their law degrees from New York University School of Law (Rosen, Horne), Columbia University School of Law (Shi), University of Chicago School of Law (Brown), Villanova University School of Law (Kim), Fordham University School of Law (Fuks, *cum laude*), Brooklyn Law School (Chan), and the University of Illinois (Hinton, *cum laude*).[3] As Lead Plaintiffs' counsel specializes in recovering funds for investors who have been defrauded by China-based companies -- like Deer Consumer Products, Inc. -- Lead Plaintiffs' counsel employs two China-licensed attorneys (Liang, Zhang). Lead

---

Feb. 2008, available at
<http://www.rtspecialty.com/rtproexec/insights/RareSpectacleTwoSecuritiesLawsuitsGoToTrial.pdf>.

[2] *Hellum v. Breyer*, 194 Cal.App. 4th 1300 (2011) (directors and officers of entities that violate securities laws are presumptively liable under California Corporations Code Section 25504, reversing Superior Court); *Apollo Capital Fund, LLC v. Roth Capital Partners, LLC*, 158 Cal.App. 4th 226 (Section 25110 of the California Corporations Code not preempted by federal law);; *In re Nature's Sunshine Prods. Inc. Sec. Litig.*, 486 F. Supp. 2d 1301, 1307 (D. Utah 2007) (a defendants statement that he had disclosed "any fraud" that he was involved with to his auditor can support securities fraud claim when defendant was allegedly involved in Foreign Corrupt Practices Act violation); *Zagami v. Natural Health Trends Corp.*, 540 F. Supp. 2d 705, 710-11 (N.D. Tex. 2008) (a defendant's failure to disclose related-party transactions amounting to 1.5% of quarterly revenue can support securities fraud claim).

[3] In addition, Lead Plaintiffs' attorneys have obtained their undergraduate degrees from well-regarded schools such as Columbia University, Johns Hopkins University, and Harvard University.

DECLARATION OF LAURENCE ROSEN IN RESPONSE TO THE COURT'S ORDER TO SHOW CAUSE DATED FEBRUARY 8, 2013 No.: CV-11-03701-DMG (MRWx)

Plaintiffs' Counsel has established many of the precedents that are routinely cited by investors seeking to recover funds from Chinese companies.[4]

## C. What lead plaintiffs have done to warrant an incentive award of up to $10,000.

6.    As a threshold matter, Lead Plaintiffs respectfully observe that it was their intention to seek a payment of up to $10,000 in total, not for each lead plaintiff. Lead Plaintiffs apologize to the Court if the language used in the notice documents[5] creates confusion, and consent to enter into a binding stipulation providing that they will not seek more than $10,000 in total.

7.    Economic theory makes clear that if efforts to create a common good are not adequately rewarded above and beyond a pro rata portion of the common good created, then persons will not undertake efforts to create the common good. Newberg on Class Actions § 14:6 (4th Ed. 2012). That is because the individual investment into procuring the common good is itself not rewarded. *See id.* This is an instance of the free-rider problem. *In re Zyprexa Prods. Liab. Litig.*, 594 F.3d 113, 129 (2d Cir. 2010). To overcome the free-rider problem, the expected reward from participation should exceed the cost of lead plaintiffs' time and the risk lead

---

[4] *Munoz v. China Expert Technology, Inc.*, No. 07 Civ. 10531 (AKH), 2011 WL 5346323 (Nov. 7, 2011) (overruling defendants' Chinese state secrecy objections in securities fraud case involving China-based company); *In re China Educ. Alliance, Inc. Sec. Litig.*, No. CV 10-9239 CAS (JCx), 2011 WL 4978483 (permitting investors to rely on certain Chinese regulatory filings and third-party reports in pleading that a China-based company committed securities fraud); *In re Fuwei Films Sec. Litig.*, 634 F. Supp. 419, 437-38 (S.D.N.Y. 2009) (that information is available in Chinese news outlets does not make it general public knowledge to relieve securities seller of obligation to disclose such information).

[5] "Attorneys for the Lead Plaintiff[s] [...] intend to ask the Court [for] an award to the Lead Plaintiffs not to exceed $10,000." Dkt. # 87-4 at 12

DECLARATION OF LAURENCE ROSEN IN RESPONSE TO THE COURT'S ORDER TO SHOW CAUSE DATED FEBRUARY 8, 2013 No.: CV-11-03701-DMG (MRWx)

plaintiff undertakes. Not only that, though -- even if the potential lead plaintiff expects to recover enough funds from the litigation to justify the expenditure of time, the potential lead plaintiff may assume that if he, she, or it elects not to become lead plaintiff, another wronged investor will step forward to recover funds. Hence, for any person to become lead plaintiff, that person must judge that the benefit they receive from themselves being lead plaintiff, as opposed to the benefit they receive from being an absent class member, is high enough to compensate them for the loss of time and money, and the risks undertaken, by being lead plaintiff. For this reason, courts have found it necessary to provide lead plaintiffs an incentive award.

8. And this case is an excellent illustration of the free-rider problem. Defendant Deer has been unusually aggressive in publicly and privately attacking plaintiffs' counsel, the investment firm that issued the report calling attention to Deer's fraud, and lead plaintiffs themselves.

9. For example, on May 2, 2011 -- the Monday morning after the Friday on which the complaint initiating this action was filed -- Deer issued a threatening press release, providing in relevant part:

> The Company believes its common stock has been manipulated in collusion among "naked" short sellers, which may include U.S. and off-shore based hedge funds/individuals that distribute false and fabricated information concerning the Company via various websites and blogs, including through SeekingAlpha.com, a website owned by Seeking Alpha Ltd., an Israeli company.
>
> In what appears to be a part of this attempted manipulation, a purported class action complaint was filed against the Company by The Rosen Law Firm. This complaint is expressly based upon the false and defamatory reports concerning the Company that were authored by a fictitious character - "Alfred Little" and published by Seeking Alpha Ltd. even though Seeking Alpha Ltd. had deleted certain false reports prior to the filing of the complaint. Litigation

DECLARATION OF LAURENCE ROSEN IN RESPONSE TO THE COURT'S ORDER TO SHOW CAUSE DATED FEBRUARY 8, 2013 No.: CV-11-03701-DMG (MRWx)

counsel for DEER has notified The Rosen Law Firm that the complaint contains numerous false and inaccurate allegations and the Company will seek sanctions against *the plaintiff* and The Rosen Law Firm if the complaint is not withdrawn in its entirety.

[Emphasis added].

10.     That day, Robert Knuts of the law firm Park & Jensen, LLP also delivered a letter to Lead Plaintiffs' counsel under Federal Rule of Civil Procedure 11. The letter requested that Lead Plaintiffs' counsel withdraw the complaint, and warning of possible sanctions against both Lead Plaintiffs' counsel and plaintiffs. A true and correct copy of the letter is attached as Exhibit 4 to this filing.

11.     The threat was not idle. On March 28, 2011 Deer sued Alfred Little, the firm that issued the report calling attention to Deer's fraud, in New York State Supreme Court. *Deer Consumer Products, Inc. v. Alfred Little*, Index No. 650823/2011 (N.Y. County Sup. Ct.)  Deer also sued a variety of other defendants. On November 30, 2012, the action was dismissed against all defendants who appeared. Dkt. # 519, at 37-38.  Nevertheless, Lead Plaintiffs believe that Alfred Little and various other parties have been put to considerable expense -- for example, the docket currently has 538 entries.

12.     And indeed, the week Lead Plaintiffs' amended complaint was served, Benjamin Wey -- Deer's promoter -- called Mr. de Sejournet. Wey threatened Mr. de Sejournet, and the company Mr. de Sejournet works for, with business and legal retaliation.

13.     Because of Defendants' threats and lawsuits, fewer class members approached Lead Plaintiffs' counsel to serve as lead plaintiffs than would otherwise in a similar case.[6]

---

[6] Lead Plaintiffs' counsel filed the initial complaint in this action and issued the PSLRA-mandated early notice. 15 U.S.C. § 78u-4(b)(3)(A).

DECLARATION OF LAURENCE ROSEN IN RESPONSE TO THE COURT'S ORDER TO SHOW CAUSE DATED FEBRUARY 8, 2013 No.: CV-11-03701-DMG (MRWx)

6

14.     By choosing to become Lead Plaintiffs even in light of these risks, Mr. de Sejournet and Universal Invest Quality Growth exposed themselves in a manner that other class members have not.

15.     Mr. de Sejournet and Universal Invest Quality Growth's decisions nonetheless to pursue this action on behalf of the Class has rewarded the Class. It is only fair that Mr. de Sejournet and Universal Invest Quality Growth be compensated out of that reward. *See Cook v. Niedert*, 142 F.3d 1004, 1016 (7th Cir. 1998) ($25,000 award is justified despite class member's objections because "[m]ost significantly, the special master found that, in filing the suit, Cook reasonably feared workplace retaliation").

16.     Amounts greater than $10,000 are routinely awarded to lead plaintiffs, and even named plaintiffs, in actions much less fraught than this one. *In re Veritas Software Corp. Sec. Litig.*, 396 Fed. App'x 815, 817 (3d Cir. 2010) ($15,000 for each lead plaintiff); *Buccellato v. AT&T Operations, Inc.*, No. C10-00463-LHK, 2011 WL 4526673, at *4 (N.D. Cal. June 30, 2011) ($20,000 to lead plaintiff, $5,000 to class representatives); *In re Xcel Energy, Inc., Sec., Deriv. & ERISA Litig.*, 364 F. Supp. 2d 980, 1000 (D. Minn. 2005) (approving a $100,000 award to lead plaintiffs, and noting that awards to lead plaintiffs are important because they further "the important policy role [lead plaintiffs] play in the enforcement of the federal securities laws on behalf of persons other than themselves"); *cf. Staton v. Boeing Co.*, 327 F.3d 938, 975-978 (9th Cir. 2003) (reversing settlement where settlement proposed to set up two-tier structure awarding more points to two-hundred class members who had stepped forward and allowed their names to be used in Title VII opt-in action and could not justify their additional payment).

17.     Indeed, the Ninth Circuit has explicitly upheld an award of $10,000 to two lead plaintiffs in an action that had settled for $1.725 million a mere four

DECLARATION OF LAURENCE ROSEN IN RESPONSE TO THE COURT'S ORDER TO SHOW CAUSE DATED FEBRUARY 8, 2013 No.: CV-11-03701-DMG (MRWx)

7

months after the plaintiffs' filing a consolidated complaint. *In re Mego Fin. Corp. Sec. Litig.*, 213 F.3d 454, 457, 462 (9th Cir. 2000).

18.    And finally, by preliminarily approving the settlement, the Court is not making a final determination as to whether Mr. de Serjounet and Universal Invest Quality Growth are actually entitled to $10,000. It is merely making the judgment that the settlement is sufficiently fair that it should be submitted to Class members to either opt-out from or object to.

### D.    What discovery lead plaintiffs undertook prior to negotiating the settlement.

19.    In any private action brought under the federal securities laws, discovery is stayed during the pendency of *any* motion to dismiss. 15 U.S.C. § 78u-4(b)(3)(B). Nor can a plaintiff take discovery after filing a complaint but before any defendant files a motion to dismiss; courts have held that discovery is stayed then as well. *In re JDS Uniphase Corp. Sec. Litig.*, 238 F. Supp. 2d 1127, 1132 (N.D. Cal. 2002); *In re American Funds Sec. Litig.*, 493 F. Supp. 2d 1103, 1104 (C.D. Cal. 2007); *see also S.G. Cowen Sec. Corp. v. U.S. Dist. Court for Northern Dist. of Cal.*, 189 F.3d 909, 912-13 (9th Cir. 1999) ("[D]iscovery should be permitted in securities class actions *only after the court has sustained the legal sufficiency of the complaint*") (internal quotations omitted) (emphasis in original).

20.    Here, the first motion to dismiss was filed on October 21, 2011; it had not been decided when the parties agreed in principle to settle the litigation on or about October 10, 2012. Hence, Plaintiffs have not yet been permitted to, and did not, take formal discovery through compulsory process, such as letters rogatory, subpoenas, requests for production, interrogatories, or requests for admission.

8

DECLARATION OF LAURENCE ROSEN IN RESPONSE TO THE COURT'S ORDER TO SHOW CAUSE DATED FEBRUARY 8, 2013 No.: CV-11-03701-DMG (MRWx)

21.     Nevertheless, both to draft an initial and an amended complaint and after the amended complaint was filed, Lead Plaintiffs retained investigators in China to gather evidence in support of their claims, evaluate the likelihood of success on the merits, and Deer's ability to pay any judgment. This investigation included:

a.      Interviews of persons with knowledge;

b.      Retaining private investigators in China;

c.      Obtaining various filings made by Deer's subsidiaries with various Chinese government entities, including corporate and tax filings made by Deer's subsidiaries;

d.      Discussions with Alfred Little, Roddy Boyd, and various other third-party analysts who investigated Deer;

e.      Exhaustive review of all information available in the public domain regarding Deer;

f.      Consultation with experts; and

g.      Obtaining credit reports on Deer's subsidiaries.

**E.      Whether the parties employed a third-party neutral to mediate their settlement.**

22.     The Parties did not employ a third-party neutral to mediate their settlement.

**F.      A description of the negotiations.**

23.     The Parties began settlement discussions in the summer of 2012. Settlement discussions involved Plaintiffs, Defendants, and Defendants' insurer. In the fall of 2012, Plaintiffs began negotiating directly with Defendants' insurer, which is the entity that is paying the proposed settlement.

9

DECLARATION OF LAURENCE ROSEN IN RESPONSE TO THE COURT'S ORDER TO SHOW CAUSE
DATED FEBRUARY 8, 2013 No.: CV-11-03701-DMG (MRWx)

24.     Settlement discussions included:

a.     Whether Deer and various defendants had committed fraud;

b.     Whether U.S.-based defendants had committed fraud;

c.     Even if those persons had committed fraud, whether Lead Plaintiffs would be able successfully to plead that they did in light of the exacting pleading standards imposed by the Private Securities Litigation Reform Act (the "PSLRA"), the fact that nearly all evidence of fraud is specifically within the defendants' possession, and the fact that no plaintiff could obtain any discovery until that plaintiff's complaint survived a motion to dismiss.

d.     Whether Lead Plaintiffs would be able to prove its claims since Defendants were located in China, and according to Lead Plaintiffs' allegations, had routinely forged documents and lied in SEC reports, such that Defendants could forge documents and otherwise be untruthful in response to compulsory discovery.

25.     Despite these discussions regarding success on the merits, however, settlement discussions focused on Defendants' ability to pay. Deer and its officers and directors' sole major U.S. asset is a $5 million Directors' and Officers' liability insurance policy (the "D&O Policy"). All defendants except for Arnold Staloff and Walter Zhao live in China.[7] Zhao and Staloff live in the U.S. but do not have substantial resources. Deer's operating subsidiaries are located in China.

26.     China ordinarily does not enforce U.S. judgments. "Whether the judgments of state and federal courts in the United States will, might, or can be enforced in China, both as a matter of Chinese law and in practice, is a question

---

[7] Other potential U.S.-based defendants -- for example, Benjamin Wey, Deer's promoter, and Goldman Kurland Mohidin, LLP, Deer's auditor -- are not released by this settlement.

DECLARATION OF LAURENCE ROSEN IN RESPONSE TO THE COURT'S ORDER TO SHOW CAUSE DATED FEBRUARY 8, 2013 No.: CV-11-03701-DMG (MRWx)

that occasionally crops up in litigation [...] Unlike many questions about the Chinese legal system, however, this one can be answered with a fair degree of confidence both as to formal law and as to actual practice: almost certainly no." Donald Clarke, The Enforcement of United States Court Judgments in China: A Research Note, George Washington University Law School Public Law and Legal Theory Working Paper No. 236, at 1 (2004). Hence, if the Class is to be compensated at all, the major source of recovery must be U.S.-based defendants or Deer's U.S.-based assets.

27.    The D&O Policy is an eroding policy, just like practically all such policies. In an eroding policy, defense costs deplete the amount of funds in the policy available to pay any claim. *See DPC Ind., Inc. v. American Intern. Specialty Lines Ins. Co.*, 615 F.3d 609, 615 n. 3 (5th Cir. 2010). Thus, every dollar that is spent on defense counsel's fees incurred in defending this action is a dollar that is not available to satisfy the Class's claims. Defendants' lead counsel William Forman charges his time at $550/hour (and his fees are on the low-end for most securities class action defense counsel). It is not unusual for a defense firm to incur fees of $750,000 just getting through the motion to dismiss stage in a securities class action. Thus, the economics of this case dictate that settlement -- if it is to be achieved at all -- must be achieved before Defendants expend the significant resources. *See In re Safety Components, Inc. Sec. Litig.*, 166 F. Supp. 2d 72, 85, 88, 91 (D.N.J. 2001) (where corporate defendant was in bankruptcy and d&o policy was only significant asset, settlement early in case was fair and reasonable).

28.    Discovery in securities class actions is notoriously expensive. *E.g. In re Genta Sec. Litig.*, Civil Action No. 04-2123 (JAG), 2008 WL 2229843, at *6 (D.N.J. May 28, 2008) (data collection would cost six-seven million dollars). Indeed, discovery is so expensive that the PSLRA was passed in part to remedy the

11

DECLARATION OF LAURENCE ROSEN IN RESPONSE TO THE COURT'S ORDER TO SHOW CAUSE DATED FEBRUARY 8, 2013 No.: CV-11-03701-DMG (MRWx)

perceived abuse of plaintiffs coercing settlements using the threat of discovery. H.R. Conf. Rep. 104-369, at 37 (1995) (opining that "[t]he cost of discovery often forces innocent parties to settle frivolous securities class actions").

29.    Hence, it was crystal clear during the settlement negotiations that the longer this action proceeded, the less money would remain in the policy and be available to pay the Class's claims.

**G.     Why a settlement that is 4.03% of maximum estimated damages is fair, adequate, and reasonable.**

30.    As noted above, the main determinant of this settlement is Defendants' ability to pay.

31.    The sole U.S.-based defendants are Walter Zhao and Arnold Staloff. Arnold Staloff was an outside director; Walter Zhao was an outside director from May to September 2009, and Deer's president from September 2009 to May 2010. A recent empirical survey found that between 1980 and 2005, there were just 13 securities suits in which outside directors made any payments, out of thousands of suits. Bernard Black et al, Outside Director Liability, 58 Stan. L. Rev. 1055, 1063-64 (2006).

32.    Every other individual defendant -- Ying He, Yuehua Xia, Zongshu Nie, Yongmei Wang, Man Wai James Chiu, and Edward Hua -- resides in China. Similarly, all of Deer's assets are located in China, except for its D&O policy, which is held with American International Group.

33.    The D&O Policy is consumed as it pays out defense costs in this action. In addition, Deer is subject to two other actions that are consuming the D&O Policy: a NASDAQ request for information, and a Securities and Exchange Commission action styled *In the Matter of Deer Consumer Products*, HO-11595.

12

DECLARATION OF LAURENCE ROSEN IN RESPONSE TO THE COURT'S ORDER TO SHOW CAUSE
DATED FEBRUARY 8, 2013 No.: CV-11-03701-DMG (MRWx)

34.     As noted above, discovery in securities class actions is notoriously expensive. If this action proceeds much beyond the pleadings, the D&O Policy will likely be quickly consumed by defense counsel's fees, leaving the Class with nothing at all.

35.     Courts recognize that the inability of defendants to withstand a greater judgment is a factor in approving a settlement. 4 Newberg on Class Actions § 11.50 and n.3 (4th ed. 2012) (collecting cases). "In most situations, unless the settlement is clearly inadequate, its acceptance and approval are preferable to lengthy and expensive litigation with uncertain results." *Id.*

36.     Yet notwithstanding the cost of discovery, the probable result of any attempt to pursue this case to trial, the cost of the NASDAQ and SEC actions, the settlement proposes to pay more than two-fifths-- $2.125 million out of $5 million million -- of the D&O Policy to the Class to settle the action.

37.     The proposed settlement is, moreover, a partial settlement. The partial settlement allows this action to continue against Deer's auditor, Goldman Kurland Mohidin LLP. Goldman is located in the U.S.

38.     Finally, according to Cornerstone Research, in a survey of all securities class actions filed between 1996 and 2009, where "plaintiff-style" damages were between $50 million and $124 million, the median settlement was for 5.3% of damages. Ellen M. Ryan and Laura E. Simmons, Securities Class Action Settlements -- 2010 Review and Analysis at 5.[8] Pursuant to Rule 23, all securities class action settlements must be approved by the Court. Hence, as this partial settlement proposes to recover 4.03% of damages just from Deer and its

---

[8] Available at < http://securities.stanford.edu/Settlements/REVIEW_1995-2010/Settlements_Through_12_2010.pdf>.

DECLARATION OF LAURENCE ROSEN IN RESPONSE TO THE COURT'S ORDER TO SHOW CAUSE DATED FEBRUARY 8, 2013 No.: CV-11-03701-DMG (MRWx)

officers and directors, it recovers almost as much as the median case just from these defendants.

### H. Why the Legal Aid Foundation of Los Angeles is an appropriate *cy pres* fund recipient in light of *Naschin v. AOL, LLC*, 663 F.3d 1034, 1039-40 (9th Cir. 2011).

39.     Where a class action settlement provides potential unclaimed funds, the parties generally have three options: (1) *cy pres*; (2) escheat to the Treasury; or (3) reversion to the defendant. *Six (6) Mexican Workers v. Arizona Citrus Growers*, 904 F.2d 1301, 1307 (9th Cir. 1990). Reversion to defendants would provide defendants with an unearned windfall. *Id.* at 1309. Escheat to the federal government would not benefit Class members. Hence, Lead Plaintiffs elected to have any unclaimed funds be donated to the Legal Aid Foundation of Los Angeles.

40.     As a threshold matter, the use of *cy pres* funds in this case is limited. The Stipulation of Settlement governs the settlement. The Stipulation of Settlement provides that, first, *all persons who file a claim will receive a portion of the settlement proceeds*. Stipulation of Settlement at D.13-14 (Dkt. # 87 at 19-20). But should any of those persons fail to cash the checks they receive within one year, then there will be cash remaining in the settlement fund. The settlement provides that all these funds from uncashed checks will be redistributed to class members who would receive more than $10 in a distribution.[9] Stipulation of Settlement at D.14. Some recipients of this redistribution might not claim their redistributed funds. *Id.* That money -- money from checks that were requested, then distributed, then not cashed, then redistributed, and then again not cashed -- is the only money

---

[9] That the checks will all for more than $10.00 increases the likelihood that they will all be cashed.

DECLARATION OF LAURENCE ROSEN IN RESPONSE TO THE COURT'S ORDER TO SHOW CAUSE DATED FEBRUARY 8, 2013 No.: CV-11-03701-DMG (MRWx)

that would revert to *cy pres*. Lead Plaintiffs' counsel has spoken with the proposed claims administrator in this case. Based on his experience administering over 200 settlements and conservative assumptions, the proposed claims administrator believes that a 2-5% non-redemption rate for each distribution is reasonable in this case. Because there are two distributions, therefore, a reasonable non-redemption rate is 0.04%-0.25% of the distributed proceeds (or about $600-$3,500). Hence, the vast majority of the settlement -- well over 99% -- will be distributed directly to class members. The estimated $600-$3,500 remainder-of-a-remainder would be, too, but for the fact that it is likely not possible to distribute such funds without incurring more than $600-$3,500 in administration expenses.

41.    In *Naschin*, the Ninth Circuit found problematic a settlement that allocated all of the settlement proceeds (minus attorneys' fees) to a *cy pres* recipient. 663 F.3d at 1036-37. Class members got nothing. *Id.* at 1037. The Ninth Circuit was concerned that a settlement provided to a charity rather than class members would "answer to the whims and self interests of the parties, their counsel, or the court," and may "create the appearance of impropriety." *Id.* at 1039. As a solution to these problems, the Ninth Circuit ordered that the court consider "(1) the objective of the underlying statute(s) and (2) the interests of the silent class members" in determining the cy pres distribution. *Id.*

42.    Here, over 99% of the settlement' will go to class members. It is only those funds that remain unclaimed after redistribution -- the remainder of a remainder that cannot adequately be distributed -- that will revert to the Legal Aid Foundation. Because the settlement is payable to the class, Lead Plaintiffs and their counsel are answerable to that class as well. Hence, this case does not raise the concerns raised in *Naschin*. And even if the case raises the same concerns as *Naschin*, they are adequately answered. The objective of the underlying statute has

DECLARATION OF LAURENCE ROSEN IN RESPONSE TO THE COURT'S ORDER TO SHOW CAUSE
DATED FEBRUARY 8, 2013 No.: CV-11-03701-DMG (MRWx)

been satisfied by distributions to class members. And absent class interests have no interest in a distribution of settlement funds that reduces the amount they can obtain from the settlement funds.

43.     This action was brought as a class action under the antifraud provisions of the Securities and Exchange Act of 1934 (the "Exchange Act.") Both Fed. R. Civ. Proc. 23 and the antifraud provisions aim to protect individuals from the depredations of well-heeled defendants.  The Legal Aid Society provides legal services to needy individuals. And courts regularly approve donations of residual funds from securities class actions to the Legal Aid Foundation. *E.g. Tate v. Restaurant Technologies, Inc.*, Civil No. 09-cv-2076 MJD/JJG, 2010 WL 6001577, at *3 (D. Minn. Nov. 29, 2010); *Freeport Partners, LLC, v. Allbritton*, No Civ.A 04-2030 (GK), at *3 n.5 (D.D.C. March 13, 2006).

44.     Should the Court doubt the suitability of the Legal Aid Foundation as a recipient, Lead Plaintiffs consent to substitution of a charity whose purpose is more closely aligned to this action -- for example, the University of San Francisco School of Law, Investor Justice Clinic, which represents investor plaintiffs in securities arbitrations and other proceedings.

## I.     Other matters.

45.     *First*, the Court's Order to Show Cause provides that "[t]he Court notes the class notice should not require class members to file their objections or opt-out requests directly with the Court." Dkt. # 92, at 2.

46.     Lead Plaintiffs respectfully observe that the notice does not require that class members file their opt-out requests with the Court. Dkt. # 87-4, at 10-11. Lead Plaintiffs respectfully observe that the notice requires that class members mail their objection to the Court, but does not require that they file their objections

16

with the Court. *Id.* at 12. Lead Plaintiffs respectfully observe that the Federal Judicial Center recommends that objectors be required to mail their objections to the court, just as they are required to do here. *Compare id. with* Federal Judicial Center, Securities Class Action Certification and Settlement: Full Notice, at 6 (go to www.fjc.gov, select "Class Action Notices Page", select "Securities class action certification and settlement: full notice") (both requiring mailing to the Court, Class Counsel, and Defense Counsel). Requiring objectors to mail objections to the clerk of the Court ensures that the Court receives all objections. Hence, Lead Plaintiffs do not believe that the Notice Documents should be amended to reflect the Court's concerns. However, if the Court does not wish to have objections mailed to it, Lead Plaintiffs consent to amending the notice document to remove the requirement that objectors mail their objections to the clerk of the Court.

47.     *Second*, a decision to preliminarily approve the Proposed Partial Settlement is not a determination that the settlement is fair, adequate, and reasonable. Rather, it is a determination that the Proposed Partial Settlement is within the range of what might be found fair, reasonable, and adequate, so that notice should be given to Class Members, and a hearing scheduled to consider final Settlement approval. Manual for Complex Litigation § 21.632, at 321 (4th ed. 2004). Even if the Court determines that the Partial Settlement is fair, adequate, and reasonable *now*, it will still be required to determine whether it is fair, adequate, and reasonable at the final Settlement hearing, because the Court <u>must</u> take Class Members' views into account. *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 946 (9th Cir. 2011) ("[C]ourts generally must weigh [...] (8) the reaction of the class members of the proposed settlement.").

DECLARATION OF LAURENCE ROSEN IN RESPONSE TO THE COURT'S ORDER TO SHOW CAUSE DATED FEBRUARY 8, 2013 No.: CV-11-03701-DMG (MRWx)

Dated:  February 22, 2013                Respectfully submitted,


_____

Laurence M. Rosen, Esq.
Lead Counsel to Lead Plaintiffs

18

DECLARATION OF LAURENCE ROSEN IN RESPONSE TO THE COURT'S ORDER TO SHOW CAUSE
DATED FEBRUARY 8, 2013 No.: CV-11-03701-DMG (MRWx)

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

**CERTIFICATE OF SERVICE**

I, Laurence Rosen, hereby declare under penalty of perjury as follows:

I am the Managing Attorney of the Rosen Law Firm, P.A., with offices at 355 South Grand Avenue, Suite 2450, Los Angeles, CA, 90071. I am over the age of eighteen.

On February 22, 2013, I electronically filed the following **DECLARATION OF LAURENCE ROSEN IN RESPONSE TO THE COURT'S ORDER TO SHOW CAUSE DATED FEBRUARY 8, 2013** with the Clerk of the Court using the CM/ECF system which sent notification of such filing to counsel of record.

Executed on February 22, 2013

_____ /s/ Laurence Rosen

19

DECLARATION OF LAURENCE ROSEN IN RESPONSE TO THE COURT'S ORDER TO SHOW CAUSE DATED FEBRUARY 8, 2013 No.: CV-11-03701-DMG (MRWx)